The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
The parties, through counsel, agreed that all relevant medical records concerning treatment of plaintiff's alleged occupational disease and all material safety data sheets for chemicals used in plaintiff's work place would be organized and submitted as additional stipulated documents, and that, to the extent possible, earnings figures for plaintiff's subsequent employment relative to the issue of partial disability, would be obtained and submitted by agreement.
The parties submitted additional documents into evidence by stipulation which are identified as Medical Records No. 1-5 and MSDS Records No. 1-7.
The parties have also submitted Defendants' Interrogatories and Plaintiff's answers thereto filed October 14, 1993, and the deposition of Dr. Dennis J. Darcey, taken June 9, 1994, for inclusion in the record, and their respective contentions.
All pre-trial stipulations and documents are incorporated herein by reference.
* * * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer.
3. ITT Hartford Insurance Company is the carrier on the risk.
4. Plaintiff's average weekly wage was $334.53, and her compensation rate is $223.04 per week. Her compensation rate for partial disability has varied depending on her capacity to earn wages at available alternative employment beginning July 20, 1993, and is to be calculated based on a formula of two thirds (2/3) of the difference between her average weekly wage while employed by defendant-employer and her weekly earnings thereafter in alternative, lower-paying employment.
5. Plaintiff began employment with defendant-employer in 1986. Defendant-employer Standard Products manufactures various parts for Ford Tempo automobiles at its Goldsboro facility. Prior to June 1991 plaintiff worked on aluminum inserts in the Door Top Department. In that job she had occasional exposure to fumes from the chemical solvent WD-40 in 1986 and 1987. She held other jobs in various parts of the plant until January, 1991, in which she had minimal direct exposure to chemical fumes.
6. In January, 1991, plaintiff returned to Door Top where she performed a sawing operation on parts and had some exposure to WD-40 being used in her work area.
7. In June, 1991, plaintiff became a press operator in the Door Trim Department. The job involved spraying WD-40 on approximately 3,000 metal parts and pieces per day. As much as three (3) quart or liter-size bottles of WD-40 was consumed per eight (8) hour shift. In December 1991, after working as press operator for six (6) months, she became ill with nausea, diarrhea, coughing and wheezing without fever. She was seen by a doctor and taken out of work for approximately nine (9) days. She returned to work for one (1) week but went out again for two (2) weeks in January 1992 when she could not get over her persistent cough and wheezing. It was at first felt that she had flu but later diagnosed as acute bronchitis.
8. Plaintiff's symptoms improved somewhat while she was out of work in December 1991 and January 1992. When she returned to work, her symptoms returned, and she developed chest tightness. She bid on a new job, mold operator, primarily to get away from the WD-40. In this job she worked at an oven which heat-cured parts for Ford Tempos as rubber lining was injected into the parts. She stood opposite her partner as each sprayed the molds with Frekote 44 and other chemical solvents to keep the parts from sticking, as many as 300 per day. The curing presses operated at above 200 degrees. Heat and fumes were released in her face as each batch was completed.
9. In addition to WD-40 and Dexter/Rudolph Frekote 44, plaintiff was also exposed in her employment to fumes from chemicals identified as WD-40 Bulk Liquid, Loctite Prism 447 Surface Adhesive (a cyanoacrylate ether classified as a pulmonary sensitizer), Ashland Mineral Spirits 66 (a Stoddard hydrocarbon solvent), Union Carbide Acetone, Dexter Copr./Rudolph Bros. Frekote 800 (containing naphthas, tri-ethane and xylene), and Solene XE-6090 Vanising Fluid (a hydrocarbon solvent), in varying amounts and at various times during her employment. None of plaintiff's jobs which exposed her to the chemical fumes were performed under exhaust hoods and she was not provided with a respirator, mask or other air filtration device. Material Safety Data Sheets for the chemicals call for respiratory protection and other engineering controls to limit entry by inhalation of the vapors from these organic solvents.
10. Plaintiff's nose and throat were irritated by the chemical fumes to which she was exposed at work, particularly when she operated the presses and later, the molds, where she was exposed to heat and fumes from WD-40 and Frekote 44. She also found the odor of Loctite Surface Adhesive particularly irritating.
11. On June 4, 1992, plaintiff developed dizziness, vertigo, increased coughing, tightness in her throat, swollen nasal passages, and weakness at work. She had to be removed from the plant and taken for emergency treatment. She was out for two (2) weeks and, upon returning, attempted to avoid chemical exposure on her job. She had a recurrence of symptoms, however, which forced her out of work on medical leave again in August for thirteen (13) weeks. She was treated by an ENT specialist, Dr. Daniel Whitley, who referred her to Dr. Dennis Darcey, an occupational medicine specialist at Duke University Medical Center.
12. Various attempts were made to place plaintiff in a job at defendant-employer's plant in early 1993, but she experienced an exacerbation of respiratory symptoms on each occasion. Following her return to the Mold Operator's job in March 1993, she became so ill that she could not tolerate exposure to the atmospheric conditions in any parts of the plant. On the advice of her physician, she did not return after April 12, 1993.
13. Prior to the occupational exposures and symptom development described herein, plaintiff had not had prior respiratory problems of any significance or asthma, and she has never smoked.
14. Plaintiff's exposure to the chemicals in her work place as described herein have caused her to develop hyper-reactive airway disease or asthma. Her airway reactivity, verified objectively by methacholine challenge testing, causes plaintiff's airways to swell and narrow when she breathes certain chemical irritants and sensitizers such as those she encountered in the work place, which produces bronchospasm or asthma-like symptoms. Similar reactions are produced when plaintiff breathes other airborne inhalants such as dust, gasoline fumes, perfumes, smoke, hair sprays, cleaning fluids, and other substances. Her repetitive exposure to chemicals in her work place as described above have placed her at greater risk of developing the condition of hyper-reactive airways disease than that faced by members of the general public who do not have such an exposure.
15. As a proximate result of her disease plaintiff was totally unable to work and earn wages at her former job or any other employment for various periods from December 1991 through July 19, 1993, a total of thirty-one (31) weeks. Since July 20, 1993, plaintiff has been capable of and has performed alternative work earning less wages than that earned in employment with defendant-employer. Plaintiff began a period of employment with earnings less than wages earned at defendant-employer on July 2, 1994.
16. Plaintiff is in need of ongoing medical treatment, including administration of bronchodilator and inhaled steroid therapy, to either improve her condition or provide relief from her symptoms.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. Plaintiff's disease, hyperreactive airways disease or asthma, is due to causes and conditions which are characteristic of and peculiar to her employment with defendant-employer. Plaintiff has developed an occupational disease. This disease is not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(13); Rutledgev. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983); Hilliardv. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982); Brooksv. Flynt, Inc., I.C. File 916506 (August 14, 1990).
2. As a proximate result of her occupational disease plaintiff was totally unable to work and earn wages in any employment for a period of thirty-one (31) weeks from December 1991 through July 19, 1993. During said periods plaintiff was temporarily totally disabled. N.C. Gen. Stat. § 97-29; Whitley v.Columbia Lumber Co., 318 N.C. 89, 348 S.E.2d 336 (1986); Kennedyv. Duke Medical Center, 101 N.C. App. 24, 398 S.E.2d 677 (1990).
3. From July 20, 1993, and thereafter, also as a proximate result of her occupational disease, plaintiff was able to work and earn lesser wages in employment than she had earned in her formed jobs with defendant-employer. During said period and for as long as her ability to work and earnings are similar, up to a total indemnity period of 300 weeks, plaintiff was and is temporarily partially disabled. N.C. Gen. Stat. § 97-30; Gupton v. BuildersTransport, 320 N.C. 38, 357 S.E.2d 674 (1987).
4. Plaintiff's occupational disease requires ongoing medical treatment for the purpose of improving her condition and providing relief from her symptoms. N.C. Gen. Stat. § 97-59;Smith v. American Efird, 305 N.C. 507, 290 S.E.2d 634 (1982).
* * * * * * * * * * *
Based upon these conclusions of law, the Full Commission have determined there exists no basis for amending the Award. Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $238.01 per week for a total of thirty-one (31) weeks, all of which has accrued.
2. Defendants shall pay compensation to plaintiff for temporary partial disability such sums as are due for the periods after July 20, 1993, during which plaintiff was able to earn wages in alternative employment which were less than that which she earned in defendant-employer's employ, according to a formula based on two thirds (2/3) of the difference between her stipulated average weekly wage and her lesser earnings per week thereafter. Said compensation payments for partial disability shall continue according to said formula, pending change of condition, up to a total of 300 weeks.
3. Defendants shall pay all medical expenses for treatment of plaintiff's occupational disease upon submission and approval of bills for same by the Industrial Commission.
4. An attorney's fee in the amount of twenty-five (25) percent of all compensation due plaintiff pursuant to agreement with her attorney is deemed fair and reasonable and shall be paid to plaintiff's counsel direct.
5. Defendants have requested a credit for benefits paid beyond June 3, 1992. However, there is insufficient convincing evidence of record that any credit is due in this case.
6. Plaintiff has requested a penalty be paid by defendants for undisputed amounts which have not been paid by defendants during the pending of this appeal to the Full Commission. While97-86.1 expressly allows for payments of undisputed amounts pending appeals to the North Carolina Court of Appeals, the statutory provision does not allow for similar provisions for appeal to the Full Commission. Accordingly, defendants will not be assessed with a penalty by the undersigned under these circumstances.
7. Defendants shall pay the costs.
IT IS FURTHER ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the __________ day of _____________________, 1995.
 S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _______________________ J. RANDOLPH WARD COMMISSIONER
S/ _______________________ BERNARD ALSTON DEPUTY COMMISSIONER
JHB/nwm 05/25/95